J-S35019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.L. & E.L., MINORS | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.R., MOTHER & R.L., FATHER | : : : : : : | |
| | : | No. 634 EDA 2019 |

Appeal from the Order Entered January 24, 2019
In the Court of Common Pleas of Monroe County
Orphans' Court at No: 54 OCA 2018,
55 OCA 2018

BEFORE: OLSON, J., STABILE, J., and STRASSBURGER, J.*

MEMORANDUM BY STABILE, J.: **FILED NOVEMBER 08, 2019**

C.R. ("Mother") and R.L. ("Father") (collectively, "Parents") appeal from the orders entered on January 24, 2019, in the Court of Common Pleas of Monroe County, involuntarily terminating their parental rights to their daughter, P.L., born in June of 2015, and their son, E.L., born in June of 2016. Upon careful review, we affirm.

In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court set forth the factual and procedural history of this case, which the testimonial evidence supports. As such, we adopt it herein. **See** Orphans' Court Opinion, 4/2/19, at 2-14.

By way of background, Monroe County Children and Youth Services ("CYS") first became involved with this family in July of 2015, shortly after P.L. was born. N.T., 11/20/18, at 6. The referral alleged that P.L. was born

_____
\* Retired Senior Judge assigned to the Superior Court.

prematurely at 32 weeks, and it alleged parental substance abuse, parental neglect, and that Mother's parental rights had been terminated in New Jersey with respect to her older children. *Id.*

In total, Mother had five older children. Orphans' Court Opinion, 4/2/19, at 3. As best we can discern, the children were born in New Jersey, and Father is not their natural or presumptive parent. One child died shortly after birth. Mother voluntarily relinquished her parental rights to three of the children, and her rights were involuntarily terminated to a fourth child. *Id.* The court found that the maternal grandmother and step-grandfather (collectively, "maternal grandparents") adopted two of Mother's children, and "Mother's two sisters are each raising a child." *Id.*

Father has one older child, and the record does not reveal the status of his parental rights to that child. Father's older child resides in the custody of that child's maternal grandmother. *Id.*; N.T., 1/23/19, at 94.

On July 20, 2015, upon P.L.'s discharge from the hospital, the juvenile court placed P.L. in emergency protective custody. N.T., 11/20/18, at 7-8. The court adjudicated P.L. dependent on July 30, 2015, but directed that CYS return her to her Parents' physical custody. *Id.* at 10.

At that time, Parents resided in a hotel room. *Id.* at 7. Father occupied the room with Mother until December of 2015, when he became incarcerated in New Jersey and was sentenced to a three-year term of incarceration. *Id.*

at 17-18, 25. Mother resided in the hotel room until approximately December of 2016. *Id.* at 38, 49.

Following P.L.'s adjudication, CYS caseworkers conducted regular home visits, during which they requested that Parents provide urine samples for drug screens. *Id.* at 10-13. Prior to his incarceration, Father never agreed to provide any drug screens. *Id.* at 17. Mother inconsistently provided urine samples, which were all positive for Suboxone. *Id.* at 12, 20. The record reveals that Mother's physician prescribes Suboxone as treatment for opioid dependency. *Id.* at 12, 20.

In addition, JusticeWorks provided parenting services to Parents in their home. *Id.* at 10-11. By March of 2016, through the time Mother left the hotel in December of 2016, the condition of the hotel room deteriorated. *Id.* at 22. Mother's hotel room contained "blatant safety hazards. . ." including a lighter, a pocket knife, and an open prescription bottle that could have been within reach of P.L. *Id.* at 32-33. In addition, the room continually had "lots of debris[,] and it was very cluttered." *Id.* at 33. Caseworkers from JusticeWorks and CYS offered to assist Mother in making the room suitable. In addition, CYS explained to Mother while P.L. was in her custody that, when P.L. became mobile, the deteriorating hotel room conditions would be unsuitable. *Id.* at 22-24, 29. By the time P.L. was removed from Mother's custody in December of 2016, she was one and one-half years old but not yet mobile due to physical delays. *Id.* at 22.

Mother did not inform CYS of her pregnancy with E.L., to whom she gave birth prematurely at 33 weeks in June of 2016. *Id.* at 26-27. CYS learned that Mother "was drug seeking" after E.L.'s birth by requesting Klonopin from hospital staff. *Id.* at 27. As a result, Mother participated in a psychiatric evaluation while at the hospital, which revealed that she did not need Klonopin. *Id.*

On August 11, 2016, the juvenile court adjudicated E.L. dependent and placed him in Mother's physical custody. In addition, the court found that aggravated circumstances existed as to Mother, but it directed that CYS provide reunification services. *Id.* at 32.

In December of 2016, CYS learned that the hotel where Mother resided with P.L. and E.L. was closing. *Id.* at 35. Mother informed CYS that she would move to New Jersey to a home owned by the maternal grandparents that they were "fixing up to sell." *Id.* at 35-36. Because the maternal grandparents were inconsistent in advising CYS about the level of support they would provide Mother, CYS removed P.L. and E.L. from Mother and placed them in foster care on December 8, 2016. *Id.* at 36-37.

Upon P.L.'s and E.L.'s removal from her care, Mother made a statement that "had to do with not wanting to live anymore." *Id.* at 37. In addition, Mother refused to allow the caseworker into her hotel room. *Id.* As such, CYS required Mother to participate in a mental health evaluation.

After P.L.'s and E.L.'s removal, Mother moved to the maternal grandparents' residence in New Jersey, which was a driving distance from CYS's location of approximately two hours. *Id.* at 37-38, 49. Initially, CYS established weekly visits at the CYS office for Mother and P.L. and E.L., and CYS transported the children to New Jersey once per month for a community visit with Mother. *Id.* at 53. In March of 2017, rather than weekly visits at the CYS office, CYS established weekend community visits supervised by Mother's stepfather. *Id.*

In addition, on March 10, 2017, CYS filed an Interstate Compact on the Placement of Children ("ICPC") in New Jersey requesting placement of P.L. and E.L. with Mother in the home of the maternal grandparents. *Id.* at 52-53. On June 1, 2017, the child welfare agency in New Jersey denied the ICPC due, in part, to concluding that Mother needed more parenting services as well as mental health services. *Id.* at 57.

As a result, CYS made a referral for Mother to obtain weekly "visit coaching" with JusticeWorks. *Id.* at 57-58. When Father was released from prison on July 9, 2017, he participated in the "visit coaching" with Mother. Because Parents missed many visits, the exact number of which is unspecified in the record, JusticeWorks canceled the "visit coaching" sometime before October 10, 2017. *Id.* at 67. Thereafter, CYS supervised visits for Parents at the CYS office, and they attended consistently. *Id.* at 67-70.

By August of 2017, Parents' Family Service Plan ("FSP") objectives required them to live a sober lifestyle, comply with random drug screens, and obtain stable housing. *Id.* at 66. In addition, Mother was required to participate in a mental health evaluation. *Id.* at 65.

In May of 2018, Parents relocated from New Jersey to the same hotel in Pennsylvania.[1] *Id.* at 70. At that time, Parents were unemployed, and Mother's stepfather paid their rent at the hotel. *Id.*

On July 25, 2018, CYS filed petitions to involuntarily terminate Parents' parental rights to P.L. and E.L. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b).[2] A hearing on the petitions occurred on November 20, 2018, and January 23, 2019, during which Parents were represented by Victoria Strunk, Esquire. Brandie Belanger, Esquire, served as the Guardian Ad Litem ("GAL") for P.L. and E.L., then ages two and three.

CYS presented testimony from caseworkers Kate Croll, Adam Shelp, Michele Haydt, and Jennifer Payne. Parents provided testimony from D.F., the maternal grandmother; P.L., the paternal grandmother; and Brittany

---

[1] Mother testified that the hotel had not closed despite the prior understanding by CYS and her that it would close. N.T., 1/23/19, at 15-16.

[2] In September of 2018, Mother gave birth to L.L., a male. As with E.L., Mother did not disclose this pregnancy to CYS. N.T., 11/20/18, at 88-91. The juvenile court adjudicated L.L. dependent, but he is not a subject of this appeal.

McCarthy, the visiting coach. In addition, Mother testified on her own behalf. Father was present during the hearing, but he did not testify.

On January 24, 2019, the orphans' court entered orders involuntarily terminating Parents' parental rights to P.L. and E.L., which it entered on the children's separate dockets. On February 22, 2019, Parents timely filed a single notice of appeal and a concise statement of errors complained of on appeal.[3] The orphans' court filed its Rule 1925(a) opinion on April 2, 2019.

On appeal, Parents present the following issues:

---

[3] Parents did not file a separate notice of appeal for the subject children. As such, on March 20, 2019, this Court issued a rule to show cause upon Parents to explain "why the above-captioned appeal should not be quashed in light of [**Commonwealth v.**]**Walker**[, 185 A.3d 969 (Pa. 2018)]. Order, 3/20/19. Parents timely responded, averring, "Due to the community of interest involving the entire family dynamic, undersigned counsel filed a single notice of appeal covering both docket numbers." Answer, 4/1/19. Further, Parents averred, "a trial court is dealing with a disrupted or dysfunctional single family unit, whose dynamics impact all its members. It therefore improves judicial economy to treat such cases, no matter their trial court docket arrangements, as a single case on appeal." **Id.**

In **Walker**, 185 A.3d at 977, our Supreme Court explained that the proper practice under Pa.R.A.P. 341 "is to file separate appeals from an order that resolves issues arising on more than one docket. The failure to do so requires the appellate court to quash the appeal." In **In the Matter of M.P.**, 204 A.3d 976, 981(Pa. Super. 2019), a panel of this Court declined to quash an involuntary termination appeal based on noncompliance with Rule 341, recognizing the possibility that "decisional law may have been unclear to this point[.]" However, in **M.P.**, this Court stated that it would quash any noncompliant appeals filed after the date of its decision, that is, February 22, 2019. **Id.** at 986. Because Parents filed their single notice of appeal from two separate docket numbers on the same date as this Court's decision in **M.P.**, we likewise decline to quash the instant appeal due to the extent that the decisional law was unclear.

1.      Whether the [c]ourt erred in determining the termination of parental rights of [P]arents . . . would best serve the needs and welfare of the minor children, P.L. and E.L.?

2.      Whether the [c]ourt erred in determining that the statutory criteria set forth in 23 Pa.C.S.A. [§] 2511 for termination of parental rights has been established by clear and convincing evidence?

3.      Whether the [c]ourt erred in its findings as they were in direct conflict with testimony provided at [the] hearing?

Parents' brief at 9 (unpaginated).

Our standard of review is abuse of discretion, as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

- 8 -

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the orders pursuant to Section 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial court

as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[4]

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may

---

[4] Based on this disposition, we need not consider 23 Pa.C.S. § 2511(a)(1) and (8).

include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Instantly, in the argument section of their brief on appeal, Parents fail to comply with Rule 2119 by not dividing their argument section into any parts. *See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued. . . ."). In addition, Parents fail to comply with Rule 2119(e) by omitting any reference to the place in the record where the evidence appears. *See* Pa.R.A.P. 2119(e) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where

the matter referred to appears (*see* Pa.R.A.P. 2132*)*)." We caution Parents' counsel that she is required to comply with the Rules regarding briefs in all material respects. *See* Pa.R.A.P. 2101 ("Briefs and reproduced records shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed, and, if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed.").

As best we can discern, Parents argue that the orphans' court abused its discretion in involuntarily terminating their parental rights pursuant to Section 2511(a) because they made reasonable efforts to satisfy their FSP objectives. Further, Parents argue that the FSP requirements for urine drug screens and Mother participating in a mental health evaluation were not reasonable. We disagree.

Michele Haydt, the CYS supervisor for this family beginning in July of 2017, testified as follows on direct examination regarding Parents' FSP goals.

Q. Let's go over the goals you reviewed with [Parents] on August 28, 2017.

A. We talked about [Mother] needing to have a mental health evaluation. She was refusing to sign a release prior to getting an evaluation because she felt that the [A]gency would tamper with the results.

We also talked about [P]arents living a sober lifestyle. [Mother] was continuing on her Suboxone treatment but we were concerned that she was just getting a script for that. She wasn't

getting any other treatment[,] and that we would want [Father] to start submitting screens as well.

We also talked about stable housing. At this point[,] they were both living in different locations in New Jersey[,] neither of which was a permanent residence.

N.T., 11/20/18, at 65-66.

With respect to why CYS required Mother to participate in a mental health evaluation even though she previously had a psychiatric evaluation in the hospital after E.L.'s birth, Ms. Haydt testified on cross-examination by Parents' counsel:

Q. So what is the reason for the request for a mental health evaluation that would be different than the request for a psych[iatric] evaluation at the hospital?

A. Well I'm not real sure what the diagnosis would be if [a person is] requesting [K]lonopin. I'm not a psychiatrist[,] but I know that the mental health referral and evaluation came after [P.L. and E.L.] came into care and [Mother] went back to her hotel room, was not allowing anyone to enter and the police needed to be called to do a safety check[.] [In addition, there were] the ongoing concerns during the year and a half that . . . [P.L. and E.L.] were in the home where she consistently did not clean, make things appropriate for her children to be there. . . .

*Id.* at 77-78. However, Ms. Haydt testified that Mother never agreed to sign a release with the provider who would perform the mental health evaluation due to her belief that CYS would tamper with the evaluation. *Id.* at 79. By the time of the subject proceeding, Jennifer Payne, the current CYS caseworker, testified that Mother never participated in a mental health evaluation. *Id.* at 98.

In addition, Ms. Payne testified that, throughout the underlying dependency matters, neither Mother nor Father obtained suitable or stable housing. *Id.* at 86-87. Further, with respect to Mother, she sporadically complied with urine drug screens, all of which were positive for Suboxone. *Id.* Mother contended that she needed it for pain relief, contrary to her physician who indicated that he prescribed it due to opioid dependence. N.T., 1/23/19, at 66. On cross-examination by CYS, Mother testified as follows.

> Q. Your counsel submitted a letter from [your] treating physician in New Jersey dated November 17, 2018, correct?
>
> A. [Y]es.
>
> Q. And isn't it true that he says that you're under his care for treatment of [o]pioid dependence?
>
> A. I do not understand why he continues to say that. I don't know if it's for insurance purposes. I honestly don't understand why he continues to say that.
>
> Q. Do you have a history of opioid dependence in your past?
>
> A. I do not. . . .

*Id.* at 54-55. Mother's testimony in this regard also contradicted that of D.F., the maternal grandmother, who testified that Mother has a history of drug addiction that "started out with pain killers." *Id.* at 84.

In addition, the orphans' court found significant that Mother did not receive counseling as part of her Suboxone treatment for opioid dependence. The court inquired of Ms. Payne:

> Q. [M]y understanding is that at least the best practice if not a requirement for Suboxone and methadone programs is that the

person receiving the medication[-]assisted therapy also receive counseling?

A. Correct.

Q. At least that's always been my understanding.

A. Mine too.

Q. And has [M]other to your knowledge ever received the counseling that would go along with the medication[-]assisted therapy?

A. Not to our knowledge.

N.T., 11/20/18, at 110. As such, Mother failed to comply with the FSP requirement to live a sober lifestyle. *Id.* at 98.

With respect to Father, at the time of the filing of the petitions, he was refusing to submit to urine screens. *Id.* at 87. Throughout this case, Father had submitted to only four drug screens, from July of 2017, through November of 2017, all of which were positive for Suboxone. *Id.* at 74, 87. P.L., the paternal grandmother, testified that Father had a drug history. *Id.* at 91-92.

Based on the foregoing testimony, we conclude that the orphans' court did not abuse its discretion in terminating Parents' parental rights pursuant to Section 2511(a)(2). P.L. and E.L. have been dependent children for essentially their entire lives, since July of 2015, and August of 2016, respectively. P.L. resided with Father from her adjudication until his incarceration in December of 2015, and with Mother from her adjudication until December of 2016, when she was approximately one and one-half years

old. E.L. never resided with Father, but he resided with Mother from the time of his adjudication until he was approximately six months old.

As such, the repeated and continued incapacity or refusal of Parents to comply with the foregoing FSP requirements has caused P.L. and E.L. to be without essential parental care, control or subsistence necessary for their physical or mental well-being. In addition, the conditions and causes of Parents' incapacity or refusal cannot or will not be remedied.

With respect to Section 2511(b), Parents assert that the court abused its discretion because they share a bond with P.L. and E.L., and they "have maintained consistent contact throughout the children's lives with the exception of a period of time where Father was incarcerated."[5] Parents' brief at 16 (unpaginated). We disagree.

The following case law is relevant.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387,

---

[5] Kate Croll, the former CYS supervisor for this family, testified that, while incarcerated, Father made no effort to maintain communication with P.L. and E.L. N.T., 11/20/18, at 50.

- 16 -

397 (Pa. Super. 2003). As we explained in **In re A.S.**, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011).

Our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **In re T.S.M.**, **supra** at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id.** at 269. The **T.S.M.** Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

Instantly, the orphans' court credited Mother's testimony that a bond exists between Parents and P.L. and E.L. However, the court found that the bond "has not been strong enough to prompt either parent to demonstrate the parental capability and stability that [P.L. and E.L.] need." Orphans' Court Opinion, 4/2/19, at 29. In addition, the court found that P.L. and E.L. "have

bonded strongly with their foster parents," who are a pre-adoptive resource.

*Id.* The court concluded,

> [G]iven th[e] facts and circumstances of these cases, the length of time [P.L. and E.L.] have been in care, their ages, and the evidence we heard, we found that whatever bond exists between Mother and Father and [P.L. and E.L.] is neither as strong nor as enduring and nurturing as the bond that exists between [P.L. and E.L.] and their foster family. Consistently, we found on balance that severing parental ties with Mother and Father would not harm [P.L. and E.L.] mentally [or] emotionally, . . . while breaking the bond with their foster parents, who for two years have for all practical purposes been their parents, would do [P.L. and E.L.] significant harm.

*Id.* at 30.

The testimonial evidence supports the court's findings. Ms. Payne testified that P.L. and E.L. are "very bonded . . . to the foster parents." N.T., 11/20/18, at 111. As best we can discern, P.L. was placed with her current foster parents in December of 2016, and E.L. was transferred to the same foster home with her on August 7, 2017. *Id.* at 63. The foster parents are a pre-adoptive resource, and Ms. Payne testified that they are meeting P.L.'s and E.L.'s special needs, which require services through the Intermediate Unit. *Id.* at 97, 99. We discern no abuse of discretion by the orphans' court in concluding that involuntarily terminating Mother's and Father's parental rights will serve the developmental, physical, and emotional needs and welfare of P.L. and E.L. pursuant to Section 2511(b). Accordingly, we affirm the orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/8/19